IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KATHERINE REED-SMITH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 06-431 |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiff, Katherine Reed-Smith, seeks judicial review of a
decision of Defendant, Commissioner of Social Security ("the
Commissioner"), denying her application for disability insurance
benefits ("DIB") under Title II of the Social Security Act, 42
U.S.C. §§ 401-433. Presently before the Court are the parties'
cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56.
For the reasons set forth below, (a) Plaintiff's motion for
summary judgment will be granted in part; (b) the Commissioner's
motion for summary judgment will be denied; and (c) the case will
be remanded to the Commissioner for further proceedings
consistent with this Memorandum Opinion.

1

## II. Background

### A. Factual Background

Plaintiff was born on March 18, 1960. With respect to education, Plaintiff graduated from high school and subsequently attended a technical school to earn a diploma as a medical assistant. (Certified Copy of Record before the Social Security Administration, Docket No. 7, "R." at 429-30). In the past, Plaintiff has worked as a telemarketer, phlebotomist, medical assistant and medical technician. (R. 75, 430-31).

In an undated Disability Report, Plaintiff indicated that she became unable to work on August 8, 2003 due to pain throughout her body and depression.[1]  (R. 61). At the time of the alleged onset of disability, Plaintiff was employed as a medical technician for West Penn Cardiology Associates, a position she had held since October 2002.  (R. 62).

Plaintiff has been treated by various doctors for her complaints of pain which began in May 2002.  (R. 61, 63-65).  In February 2004, Plaintiff was diagnosed with fibromyalgia.[2]  (R.

---

[1] In response to the question "Why did you stop working?", Plaintiff stated: "Constant pain, sometimes swelling, limited movement in left leg, arm, shoulder, foot, weakness on left side of body constantly, my balance was off, in addition to these problems, I was getting constant headaches and lightheadedness, I could no longer perform my duties at work."  (R. 61).

[2] Fibromyalgia makes you feel tired and causes muscle pain and "tender points."  Tender points are places on the neck, shoulders, back, hips, arms or legs that hurt when touched. People with fibromyalgia may have other symptoms, such as trouble

2

91).  Regarding her depression, Plaintiff is treated by a
therapist and a psychiatrist and she takes medication.  (R. 439,
441-42).  On October 4, 2004, Plaintiff was admitted to Forbes
Regional Hospital through the Emergency Department following a
recommendation by her therapist that she go to the hospital due
to suicidal ideation.  Plaintiff was treated and discharged on
October 20, 2004.  Her diagnoses at the time of discharge
included (a) Major depression, recurrent nonpsychotic, severe,
and (b) Possible borderline personality.  (R. 376-96).

## B.  Procedural History

Plaintiff filed an application for DIB on August 18, 2004,
alleging disability since August 8, 2003 due to fibromyalgia and
depression.[3]  (R. 49-52, 61).  Following the denial of

---

sleeping, morning stiffness, headaches, and problems with
thinking and memory, sometimes called "fibro fog."  No one knows
what causes fibromyalgia.  Anyone can get it, but it is most
common in middle-aged women.  People with rheumatoid arthritis
and other autoimmune diseases are particularly likely to develop
fibromyalgia.  There is no cure for fibromyalgia, but medicines
can help you manage your symptoms.  Getting enough sleep and
exercising may also help.  See www.nlm.nih.gov/medlineplus/
fibromyalgia.html (last visited May 7, 2007).

[3]Disabled individuals who have paid into the Social Security
system are eligible for DIB which operates as a type of insurance
against disability.  Just as an insurance policy lapses after the
policy owner ceases to pay the premiums, the same is true for
DIB.  Within a certain period of time after an individual stops
paying into the Social Security system, the individual loses
eligibility for DIB.  To receive DIB after losing disability
insured status, a claimant must demonstrate that he or she became
disabled prior to the expiration of his or her disability insured
status.  See Belcher v. Apfel, 56 F.Supp.2d 662 (S.D.W.V.1999).

Plaintiff's application for DIB on December 16, 2003, she

requested a hearing before an Administrative Law Judge ("ALJ").

(R. 31-35, 36-37). At the hearing, which was held on January 18,

2005, Plaintiff, who was represented by counsel, and a vocational

expert ("VE") testified. (R. 426-48).

On November 10, 2005, the ALJ issued a decision denying

Plaintiff's application for DIB. Specifically, the ALJ concluded

that Plaintiff retained the residual functional capacity ("RFC")

to perform a range of sedentary work existing in significant

numbers in the national economy.[4] (R. 15-22). Plaintiff

requested review of the ALJ's decision. (R. 11). However, the

request was denied by the Appeals Council on January 31, 2006,

rendering the ALJ's decision the final decision of the

Commissioner. (R. 7-9). This appeal followed.

---

In the present case, Plaintiff's earnings record shows that she
has acquired sufficient quarters of coverage to remain insured
for DIB purposes through December 31, 2007. (R. 15).

[4] Under the Social Security Regulations, RFC is defined as
the most a claimant can still do despite his or her limitations,
20 C.F.R. § 404.1545, and sedentary work is defined as work which
involves lifting no more than 10 pounds at a time and
occasionally lifting or carrying articles like docket files,
ledgers, and small tools. Although a sedentary job is defined as
one which involves sitting, a certain amount of walking and
standing is often necessary in carrying out job duties. 20
C.F.R. § 404.1567(a).

4

**III.   Jurisdiction and Standard of Review**

The Court has jurisdiction of this appeal under Section 405(g) of the Social Security Act, which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the individual resides.  Based upon the pleadings and the transcript of the record, the district court has the power to enter a judgment affirming, modifying or reversing the Commissioner's decision with or without a remand for a rehearing.  42 U.S.C. § 405(g).

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971). It consists of something more than a mere scintilla, but something less than a preponderance.  Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979).  Even if the Court would have decided the case differently, it must accord deference to the Commissioner and affirm the findings and decision if supported by substantial evidence.  Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir.1986).

If a claimant is found to be engaged in substantial
gainful activity, the disability claim will be denied.
Bowen v. Yuckert, 482 U.S. 137, 140, 107 S.Ct. 2287,
2290-91, 96 L.Ed.2d 119 (1987).  In step two, the
Commissioner must determine whether the claimant is
suffering from a severe impairment.  20 C.F.R.
§ 404.1520(c).  If the claimant fails to show that her
impairments are "severe," she is ineligible for
disability benefits.

In step three, the Commissioner compares the
medical evidence of the claimant's impairment to a list
of impairments presumed severe enough to preclude any
gainful work.  20 C.F.R. § 404.1520(d).  If a claimant
does not suffer from a listed impairment or its
equivalent, the analysis proceeds to steps four and
five.  Step four requires the ALJ to consider whether
the claimant retains the residual functional capacity
to perform her past relevant work.  20 C.F.R.
§ 404.1520(d).  The claimant bears the burden of
demonstrating an inability to return to her past
relevant work.  Adorno v. Shalala, 40 F.3d 43, 46 (3d
Cir.1994).

If the claimant is unable to resume her former
occupation, the evaluation moves to the final step.  At
this stage, the burden of production shifts to the
Commissioner, who must demonstrate the claimant is
capable of performing other available work in order to
deny a claim of disability.  20 C.F.R. § 404.1520(f).
The ALJ must show there are other jobs existing in
significant numbers in the national economy which the
claimant can perform, consistent with her medical
impairments, age, education, past work experience, and
residual functional capacity.  The ALJ must analyze the
cumulative effects of all the claimant's impairments in
determining whether she is capable of performing work
and is not disabled.

Plummer, 186 F.3d at 428.

*    *    *

220 F.3d at 118-19.

7

With respect to the ALJ's application of the five-step
sequential evaluation process in the present case, steps one and
two were resolved in Plaintiff's favor: that is, the ALJ found
that Plaintiff has not engaged in substantial gainful activity
since her alleged onset date of disability, and the medical
evidence established that Plaintiff suffers from fibromyalgia
which causes ongoing complaints of pain in her left shoulder,
back and left knee, major depressive disorder and borderline
personality disorder, which are severe impairments.  (R. 17).

Turning to step three, the ALJ found that no listing existed
for fibromyalgia, and that Plaintiff's depression was not
sufficiently severe to meet or equal the requirements of Listing
12.04 in 20 C.F.R., Pt. 404, Subpt. P, App. 1, relating to
Affective Disorders.[5]  (R. 18-19).  As to step four, the ALJ
found that Plaintiff cannot perform her past relevant work as a
telemarketer, phlebotomist and medical assistant in light of her
RFC.  Specifically, the ALJ noted that all of Plaintiff's prior

---

[5]Listing 12.04 describes Affective Disorders as follows:
"Characterized by a disturbance of mood, accompanied by a full or
partial manic or depressive syndrome.  Mood refers to a prolonged
emotion that colors the whole psychic life; it generally involves
either depression or elation."  Listing 12.04 then sets forth the
level of severity that is required for an individual to meet the
listing.  In his decision, the ALJ thoroughly analyzed
Plaintiff's mental impairment under Listing 12.04, and concluded
that Plaintiff did not satisfy the criteria.  (R. 18-19).
Plaintiff has not challenged the ALJ's decision in this regard.

jobs required direct interaction with the general public which
was precluded by her RFC.[6]   (R. 20).

Finally, regarding step five, based on the testimony of the
VE, the ALJ found that, considering Plaintiff's age, education,
past work experience and RFC, there were a significant number of
jobs in the national economy which Plaintiff could perform,
including the jobs of a packer/inspector, security monitor and
dispatcher.   (R. 21).

## B. Plaintiff's Arguments

Plaintiff raises three arguments in support of her motion
for summary judgment in which she seeks a remand of this case to
the Commissioner for further proceedings.   First, Plaintiff
asserts that the ALJ erred by giving controlling weight to the
"unclear" conclusions of a consultative examiner, Dr. Noah Bass.[7]

_____

[6]The ALJ concluded that Plaintiff retained the RFC "to
perform sedentary work with occasional postural changes.  She can
never crawl or reach overhead with her left arm.  She must avoid
crowds and direct interaction with the general public, avoid
decision-making and competitive production rate pace and avoid
extreme cold temperatures, described as below 40 degrees."  (R.
19).

[7]Although Plaintiff characterizes the weight attributed by
the ALJ to Dr. Bass's opinion as "controlling," the Court agrees
with the Commissioner that "nowhere in his decision does the ALJ
specifically state that he determined Plaintiff could perform
sedentary work because he had given 'controlling weight' to Dr.
Bass' opinion."  As the Commissioner further notes, under the
Social Security Regulations, an ALJ may give controlling weight
only to the opinion of a treating source, 20 C.F.R.
§ 404.1527(d)(2), and Dr. Bass was a consulting examiner, not a
treating source.  (Commissioner's Brief in Support, Docket No.

9

Second, Plaintiff asserts that the ALJ erred by failing to discuss the Global Assessment of Functioning scores assigned to Plaintiff by her mental health provider which indicate that her mental impairment results in serious symptoms or serious impairments. Third, Plaintiff asserts that as a result of the foregoing errors by the ALJ, he failed to pose a hypothetical question to the VE which was "accurate." Therefore, the ALJ's reliance on the VE's testimony to deny Plaintiff's claim for DIB was erroneous. The Court will address each argument individually.

**1. The opinion of Dr. Noah Bass, a consultative examiner:**

Plaintiff was referred to Dr. Bass by the Pennsylvania Bureau of Disability Determination for a consultative examination, which was performed on March 16, 2005. In a report prepared by Dr. Bass following his examination of Plaintiff, Dr. Bass described Plaintiff's functional abilities in light of her impairments as follows:

> With regard to ability to perform work-related activities; (sic) the patient does have impairments. She has difficulty lifting and carrying, and may occasionally carry up to 10 pounds for less than one-third of an eight-hour day. **Standing and walking are limited to not more than 15 minutes at a time for a total of less than two hours in an eight-hour workday.** This is due to problems with both back pain

---

12, "Df's Brief", at p. 12). Nevertheless, in finding that Plaintiff retained the RFC for sedentary work, it is apparent from the ALJ's decision that he attributed significant weight to Dr. Bass's opinion concerning Plaintiff's functional abilities.

10

and ankle pain related to problems noted above.[8] **With
regard to sitting**, she would need to be allowed to shift
positions frequently as little as every 20 to 30 minutes in
an eight-hour workday, but **would be permitted to sit for at
least six hours in an eight-hour workday**. She would not be
expected to kneel, crouch, stoop, balance or crawl due to
problems both with the ankle and the back. She may climb
standard stairs occasionally in an eight-hour workday. She
may not climb ladders due to ongoing problems with her
shoulder.[9] She was not specifically examined for problems
with seeing, speaking or hearing. Pushing and pulling are
limited to occasionally and not more than 10 pounds. She
may handle small objects. She has no particular problems
with handling small objects. She was not specifically
examined regarding environmental restrictions. (Emphasis
added).

(R. 423-24).

In determining that Plaintiff retained the RFC to perform a

limited range of sedentary work,[10] the ALJ relied, in large part,

_____

[8]Plaintiff's back and ankle problems to which Dr. Bass was
referring were low back pain with a history of small right
paravertebral disc protrusion at L4-L5 and left ankle pain with a
history of osteochondritis dissecans. (R. 423). With respect to
Plaintiff's history of ankle pain, Dr. Robert W. Mendicino
performed surgery on Plaintiff's left ankle on November 19, 2003
for diagnoses of (1) Osteochondritis dissecans/osteochondral dome
lesion and (2) ankle joint synovitis/capsulitis, left. (R. 370-
74).

[9]With respect to Plaintiff's "ongoing problems with her
shoulder," in January 2004, Plaintiff underwent a left shoulder
arthroscopy for removal of a spur with impingement. On May 18,
2004, Plaintiff was examined by Dr. Albert Carvelli for
complaints of left upper back and neck pain and muscle spasm.
One of Dr. Carvelli's impressions following the examination was
"Left shoulder myofascial pain and tendonitis." (R. 361-63).

[10]The ALJ concluded that Plaintiff was unable to perform the
full range of sedentary work due to the following limitations:
(a) the need for occasional postural changes; (b) the need to
avoid crawling and reaching overhead with her left arm; (c) the
need to avoid crowds and direct interaction with the general

11

on Dr. Bass's opinion concerning Plaintiff's functional
abilities, noting that Dr. Bass's objective findings were
consistent with those of treating sources, although the ALJ did
not identify specifically the treating source evidence on which
he relied in making this observation.  With respect to
Plaintiff's RFC determination, the ALJ also noted that the State
agency medical consultant had found Plaintiff capable of
sedentary work with some additional limitations.[11]  (R. 19-20).

        Regarding RFC determinations, Social Security Ruling ("SSR")
96-8p provides that "RFC is the individual's *maximum* remaining
ability to do sustained work activities in an ordinary work
setting on a **regular and continuing** basis," and "a 'regular and
continuing basis' means 8 hours a day, for 5 days a week, or an

_____

public; (d) the need to avoid jobs involving decision-making and
competitive production rates; and (e) the need to avoid extreme
cold temperatures, described as below 40 degrees.  (R. 19).
Despite these limitations, based on the testimony of the VE, the
ALJ found at step five of the sequential evaluation process that
a significant number of sedentary jobs existed in the national
economy which Plaintiff was capable of performing.  (R. 20-21).

[11]Based on a review of the record in this case, the State
agency medical consultant to whom the ALJ was referring completed
an assessment of Plaintiff's physical RFC on November 26, 2003.
With respect to Plaintiff's ability to stand, walk and sit, the
State agency medical consultant's opinion differed from the
opinion of Dr. Bass.  Specifically, the State agency medical
consultant opined that Plaintiff could stand and/or walk **at least**
2 hours in an 8-hour workday, and that Plaintiff could sit **about**
6 hours in an 8-hour workday.  (R. 298-308).

equivalent work schedule."[12] Plaintiff contends that the ALJ erred in relying on Dr. Bass's opinion to find that she retained the RFC to perform sedentary work on a regular and continuing basis because, at best, Dr. Bass's opinion was vague or unclear in this regard. Specifically, Plaintiff notes that Dr. Bass opined that she could stand and walk for **less than** 2 hours during an 8-hour workday and that she could sit for **at least** 6 hours during an 8-hour workday, which does not necessarily equal 8 hours or the meaning of the ability to work on a regular and continuing basis under SSR 96-8p. (Plaintiff's Brief in Support, Docket No. 10, "Pl's Brief", at pp. 7-10).

The Commissioner disputes Plaintiff's claim that Dr. Bass's opinion regarding her ability to work on a regular and continuing basis is vague. The Commissioner maintains that "it is plain that Dr. Bass was aware that he was required to assess Plaintiff's functional abilities in an 8-hour workday," noting that "Dr. Bass never specifically opined that Plaintiff could not work a full 8-hour workday." Essentially, the Commissioner's argument is that the only plausible interpretation of Dr. Bass's

---

[12]Social Security Rulings are agency rulings published "under the authority of the Commissioner of Social Security" and "are binding on all components of the Social Security Administration." Sykes v. Apfel, 228 F.3d 259, 271 (3d Cir.2000).

13

opinion is one in which "less than 2 plus at least 6 equals 8."[13] (Df's Brief at p. 14).

After consideration, the Court agrees with Plaintiff that Dr. Bass's opinion concerning her ability to work on a regular and continuing basis is unclear. Contrary to the Commissioner's position, the Court cannot conclude that "less than 2 plus at least 6 necessarily equals 8." Moreover, as noted in footnote 11, Dr. Bass's opinion concerning Plaintiff's ability to stand, walk and sit in an 8-hour workday is inconsistent with the opinion rendered by the State agency medical consultant, and the ALJ failed to address the inconsistency despite SSR 96-8p, which provides that "the adjudicator must ... describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record," and "[t]he adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered

_____

[13]In connection with Plaintiff's first argument, the Commissioner also cites to evidence in the record which he asserts provides substantial evidence supporting the ALJ's RFC determination. (Df's Brief at pp. 15-18). As noted by Plaintiff, however, in light of the ALJ's failure to state that he specifically relied on this evidence in determining Plaintiff's RFC, the Court's consideration of the evidence would violate the Supreme Court's holding in SEC v. Chenery Corp., 318 U.S. 80 (1943), that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." Id. at 87. (Plaintiff's Reply Brief, Docket No. 13, at p. 5). See also Fargnoli v. Massanari, 247 F.3d 34, 44 n.7 (3d Cir.2001).

14

and resolved." Under the circumstances, the case will be remanded for further consideration of Plaintiff's RFC.[14]

## 2. **Plaintiff's Global Assessment of Functioning scores**:

The Global Assessment of Functioning ("GAF") Scale considers psychological, social, and occupational functioning on a hypothetical continuum of mental health - illness, and does not include impairment in functioning due to physical or environmental limitations. The highest possible score is 100, and the lowest is 1. GAF scores between 41 and 50 denote the following: **"Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). See American Psychiatric

---

[14]Following the ALJ's decision in this case, Plaintiff's counsel submitted a letter from Dr. Martin Seltman, her treating physician at Metro Family Practice, in support of her claim for DIB, and the letter was considered by the Appeals Council in connection with Plaintiff's request for review of the ALJ's decision. In the letter, which is dated December 21, 2005, Dr. Seltman notes that Plaintiff has been treated by the physicians at Metro Family Practice for her "rather complicated medical history" since October 2002, and that he has been caring personally for Plaintiff since October 2004. Dr. Seltman concludes the letter as follows: "... Her pain and weakness, particularly on the left side, precludes her doing any consistent work activity. It is my professional opinion that she is fully disabled and should receive Social Security Disability benefits." (R. 425). Although Dr. Seltman's disability opinion is not binding because it is an issue reserved to the Commissioner, the Court suggests that, on remand, the Commissioner or Plaintiff's counsel obtain an assessment of Plaintiff's ability to perform physical work-related activities from Dr. Seltman in light of Plaintiff's long history of treatment by Metro Family Practice.

15

Association: Diagnostic and Statistical Manual of Mental

Disorders, Fourth Edition, Text Revision, 2000, at 34 (bold face

in original).

Plaintiff receives treatment for depression and anxiety at

Allegheny East MH/MR.  On January 14, 2004, following plaintiff's

initial evaluation, Ivan Lambert, Primary Clinician, noted that

Plaintiff's current GAF score was 50 and that her highest and

lowest GAF scores during the previous year were 50 and 45,

respectively.[15]  (R. 324).  On August 9, 2004, the identical GAF

scores were assigned to plaintiff by her mental health provider

at Allegheny East MH/MR.  (R. 314).  Plaintiff contends that the

ALJ erred by failing to discuss these GAF scores which, according

to Plaintiff, "by definition reflects her treating sources (sic)

conclusion that she is unable to work."[16]  (Pl's Brief at p. 11).

---

[15]Plaintiff's diagnoses following her initial evaluation on
January 14, 2004 were major depressive disorder, recurrent,
unspecified and anxiety disorder, not otherwise specified.  (R.
324).

[16]Although not mentioned by Plaintiff, GAF scores were
assigned to her in connection with a hospitalization at Forbes
Regional Hospital from October 4 to October 20, 2004, due to the
expression of suicidal ideation (R. 376-96), and the ALJ also
failed to address these scores.  At the time of admission,
Plaintiff was assigned a GAF score of 21 (which denotes behavior
considerably influenced by delusions or hallucinations or serious
impairment in communication or judgment or inability to function
in almost all areas), and at the time of discharge, she was
assigned a GAF score of 50.  (R. 387).

16

In response to this argument, the Commissioner asserts that although the ALJ did not mention Plaintiff's GAF scores in the records of Allegheny East MH/MR, he did specifically refer to those records in assessing Plaintiff's mental RFC. In addition, the Commissioner asserts that, standing alone, a GAF score of 50 does not establish the presence of an impairment which automatically precludes Plaintiff from working. (Df's Brief at pp. 20-21).

After consideration, the Court agrees with the Commissioner that the GAF scores assigned to Plaintiff by the clinician at Allegheny East MH/MR (which are in the same range as the GAF score assigned to Plaintiff at the time of her discharge from Forbes Regional Hospital on October 20, 2004) do not dictate a conclusion that she is unable to work. See, e.g., Lopez v. Barnhart, No. 03-2035, 2003 WL 22351956 (10 Cir. Oct. 16, 2003)("Contrary to claimant's contention, a GAF score of 40 may indicate problems that do not necessarily relate to the ability to hold a job.... Thus, standing alone, the GAF score does not evidence an impairment seriously interfering with claimant's ability to work."). Nevertheless, the Court concludes that the ALJ erred by failing to address Plaintiff's GAF scores which denote serious symptoms or a serious mental impairment.

In Santiago-Rivera v. Barnhart, No. 05-5698, 2006 WL 2794189 (E.D.Pa. Sept. 26, 2006), the plaintiff sought judicial review of

17

the Commissioner's decision denying her claim for DIB due to
impairments including headaches, sleep apnea, back pain, asthma,
depression and anxiety and morbid obesity.  The plaintiff argued,
among other things, that the ALJ erred by failing to address her
GAF score of 50.  In remanding the case for the Commissioner to
address the plaintiff's GAF score, the district court stated:

\*   \*   \*

     Pursuant to the final rules of the Social Security
Administration, a claimant's GAF score is not considered to
have a "direct correlation to the severity requirements."
66 Fed.Reg. 50746, 50764-65 (2000).  However, the rules
still note that the GAF remains the scale used by mental
health professionals to "assess current treatment needs and
provide a prognosis."  Id.  As such, it constitutes medical
evidence accepted and relied upon by a medical source and
must be addressed by an ALJ in making a determination
regarding a claimant's disability.  Although the ALJ "may
properly accept some parts of the medical evidence and
reject other parts ... he must consider all the evidence and
give some reason for discounting the evidence he rejects."
Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir.1994).

     In Span ex rel. R.C. v. Barnhart, 2004 WL 1535768
(E.D.Pa. May 21, 2004), this Court held that an ALJ's
determination of a claimant's level of function was not
supported by substantial evidence because of the ALJ's
failure to explain how he weighed and discounted the
significance of the claimant's GAF scores.  Id. at \*9.  In
Span, the ALJ relied upon the findings of a particular
doctor in concluding that claimant's condition did not meet
the requirements to be considered disabled under the law.
Id. at \*7.  Ultimately, the Span court held that the "ALJ's
written opinion does not evidence that he seriously
considered and weighed the importance of these scores," and
the case was remanded in order that the ALJ could clarify
the basis for his holding.  Id.

     In Escardille v. Barnhart, 2003 WL 21499999 (E.D.Pa.
June 24, 2003), this Court also addressed the significance
of an ALJ's consideration of GAF scores in reaching a

18

decision on a claimant's disability status. In Escardille, the ALJ failed to mention the claimant's GAF score of 50, and we concluded that the test score "constituted a specific medical finding" that the claimant was unable to perform competitive work. Id. at **6-7 (citing Cotter v. Harris, 642 F.2d 700, 705 (3d Cir.1981)).

This case is directly akin to Escardille. As in Escardille, here the ALJ's written opinion contains no reference to the GAF score and thus the Court must conclude that the ALJ did not consider or weigh Santiago-Rivera's GAF score. It is clear that Santiago-Rivera received a GAF score indicating serious symptoms, however the ALJ in this case simply failed to discuss that score.

Because a GAF constitutes medical evidence accepted and relied upon by a medical source, it should be addressed by an ALJ in making a determination regarding a claimant's disability. After examining the record and the GAF score contained therein, the Court finds that while the ALJ provided an explanation regarding the evidence he relied upon, he failed to disclose any reasons for not considering the GAF score. (Footnote omitted).[17] See Span, 2004 WL 1535768, at *8 (citing Adorno, 40 F.3d at 48). Upon remand, the ALJ must address Santiago-Rivera's GAF score.

\* \* \*

2006 WL 2794189, at ** 9-10.

Based on the foregoing, on remand, the ALJ is directed to discuss

Plaintiff's GAF scores in connection with the determination of

her RFC.[18]

---

[17]In the omitted footnote, the district court in Santiago-Rivera stated that, despite its conclusion that a remand was required for the ALJ's consideration of the plaintiff's GAF score, it was "not to say that the Court finds that the GAF score in question necessarily indicates that Santiago-Rivera is disabled under the Act." 2006 WL 2794189, at *10 n.12.

[18]In light of Plaintiff's well-documented treatment for depression, the Court suggests that, on remand, the Commissioner obtain a Mental Residual Functional Capacity Assessment by a State agency physician or that either the Commissioner or

19

**3.  The hypothetical questions posed to the VE by the ALJ:**

The ALJ initially asked the VE to assume a hypothetical

individual of Plaintiff's age, education and work experience who

has the capacity to perform sedentary work with the following

limitations: (1) the inability to crawl or reach overhead with

the left arm (although the individual is right-handed); and (2)

the need to avoid crowds and direct interaction with the public.

The ALJ then asked the VE whether this hypothetical individual

could perform Plaintiff's past work or any other work.  In

response, the VE testified that Plaintiff's past work would be

precluded because her only sedentary job, which was the

telemarketing job, required interaction with the public.  As to

any other work, the VE testified that the hypothetical individual

could perform the following jobs: packer/inspector (2,002 jobs

nationally),[19] assembler (156,000 jobs nationally) and

sorter/grader (70,000 jobs nationally).  (R. 445-46).

---

Plaintiff's counsel obtain a Medical Source Statement from one of
Plaintiff's mental health providers regarding her ability to
perform work-related mental activities to assist in the
determination of Plaintiff's RFC.

[19]The transcript of the hearing before the ALJ contains an
obvious typographical error concerning the VE's testimony with
respect to the number of packer/inspector jobs which were
available that the hypothetical individual could perform.  The
number could not have been 2,002 because the VE subsequently
testified in response to a further hypothetical question from the
ALJ that the number would be reduced to 50,000 handpacker jobs.
(R. 445-46).

20

The ALJ then asked the VE to assume that the hypothetical individual also needed to avoid stress "in the sense of decision making on the job and competitive production rate pace." When asked whether this additional limitation would change his testimony, the VE responded affirmatively, stating that the additional limitation would reduce the number of suitable hand packer jobs (50,000 jobs nationally) and eliminate the job of sorter/grader, but that he would add the jobs of security monitor/guard (106,000 jobs nationally) and dispatcher (31,000 jobs nationally) to the list of jobs that the hypothetical individual could perform. (R. 446).

Finally, the ALJ asked the VE whether his testimony would change if the hypothetical individual also needed to avoid very cold temperatures, i.e., below 40 degrees, and the VE testified that it would not.[20] (R. 446).

Plaintiff asserts that in light of the ALJ's failure to acknowledge the ambiguity in Dr. Bass's opinion concerning her

---

[20]Following the conclusion of the ALJ's questioning of the VE, Plaintiff's counsel posed one question to the VE: what do employers ordinarily expect from employees performing unskilled, entry-level work in terms of breaks, absences and length of a workday? The VE testified that jobs are 8 hours a day, 5 days a week; that an employee would be permitted to miss one day, and occasionally 2 days, of work per month; that employees are given a 15-minute break after 2 hours of work, a 30-minute break after 4 hours of work and another 15-minute break after 6 hours of work; and that other than one or two bathroom breaks, an employee must be on task the remainder of the time. (R. 447).

21

ability to perform work on a regular and continuing basis, as well as the ALJ's failure to discuss the significance of her GAF scores, the hypothetical question posed to the VE by the ALJ was inaccurate, also requiring a remand of this matter for further proceedings. (Pl's Brief at pp. 13-16). See, e.g., Ramirez v. Barnhart, 372 F.3d 546 (3d Cir.2004)(Commissioner's decision denying claim for SSI vacated and remanded where the ALJ's hypothetical question to VE did not accurately convey all of disability claimant's impairments and the limitations they caused, and, therefore, the ALJ's decision denying SSI was not supported by substantial evidence). In response to this argument, the Commissioner asserts that the ALJ's hypothetical question to the VE was proper because it "fairly set out all of Plaintiff's impairments that were supported by the objective medical evidence." (Df's Brief at p. 24).

After consideration, the Court does not agree with Plaintiff that the hypothetical questions posed to the VE necessarily were inaccurate as a result of the ALJ's failure to resolve the ambiguity in Dr. Bass's opinion regarding her ability to work on a regular and continuing basis and the ALJ's failure to discuss her GAF scores. If the ALJ reaches the same conclusion regarding Plaintiff's RFC after addressing these issues and any additional evidence that may be submitted by the parties on remand, it appears to the Court that there would be no need for further VE

22

## IV.  Legal Analysis

### A.  The ALJ's Determination

In order to establish a disability under the Social Security
Act, a claimant must demonstrate an inability to engage in any
substantial gainful activity due to a medically determinable
physical or mental impairment which can be expected to result in
death or which has lasted or can be expected to last for a
continuous period of not less than 12 months.  42 U.S.C.
§ 423(d)(1).  A claimant is considered unable to engage in any
substantial gainful activity only if her physical or mental
impairment or impairments are of such severity that she is not
only unable to do her previous work but cannot, considering her
age, education, and work experience, engage in any other kind of
substantial gainful work which exists in the national economy.
42 U.S.C. § 423(d)(2)(A).

In Burnett v. Commissioner of Social Security Admin., 220
F.3d 112 (3d Cir.2000), the Third Circuit discussed the procedure
an ALJ must follow in evaluating a claim for Social Security
disability benefits, stating in relevant part:

\*    \*    \*

In Plummer, we recounted the five step sequential
evaluation for determining whether a claimant is under a
disability, as set forth in 20 C.F.R. § 404.1520:

In step one, the Commissioner must determine
whether the claimant is currently engaging in
substantial gainful activity.  20 C.F.R. § 404.1520(a).

6

testimony.   However, the necessity of additional VE testimony is

a matter for the Commissioner to consider upon remand.

_William L. Standish_

William L. Standish
United States District Judge

Date: May ___, 2007

23